## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| KALSHIEX LLC, <br><br>    Plaintiff, <br><br> v. <br><br> BRENNA BIRD, in her official capacity as Attorney General of Iowa; the IOWA RACING & GAMING COMMISSION; TINA EICK, in her official capacity as Administrator of the Iowa Racing & Gaming Commission; AMY BURKHART, in her official capacity as Chair of the Iowa Racing & Gaming Commission; DARYL OLSEN, in his official capacity as Vice Chair of the Iowa Racing & Gaming Commission; MICHAEL BOAL, in his official capacity as Member of the Iowa Racing & Gaming Commission; ALAN OSTERGREN, in his official capacity as Member of the Iowa Racing & Gaming Commission, <br><br>    Defendants. | Case No. __4:26cv00109__ <br><br><br> **COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |

1

## INTRODUCTION

1.      This action challenges the State of Iowa's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC").  7 U.S.C. § 2(a)(1)(A).  On information and belief, there is a substantial risk that the Attorney General of Iowa (the "Iowa AG") will bring an enforcement action against Plaintiff KalshiEX LLC ("Kalshi" or "Plaintiff") on behalf of the Iowa Racing & Gaming Commission ("IRGC" or the "Commission") with the intent to prevent Kalshi from offering event contracts for trading on its federally regulated exchange.

2.      Just last week, a Kalshi representative met with Defendant Bird for what he thought was a meeting to introduce Defendant Bird to Kalshi and prediction markets and to discuss a tax bill currently under consideration in the state legislature.  Instead, he was greeted by a panel of attorneys, including Iowa's Solicitor General, who proceeded to ask a series of pointed questions challenging whether Kalshi's federally regulated offerings ran afoul of (preempted) Iowa state law. Following the meeting, which Defendant Bird characterized as "like a deposition," Defendant Bird explained to Kalshi's representative that the Iowa AG has been "looking at" Kalshi for a "long time."  Understandably concerned by the tenor of what was intended to be a friendly meeting on a different topic, on March 10, 2026, Kalshi contacted a representative of the Iowa AG to seek assurances that the Iowa AG did not intend to bring an enforcement action against Kalshi.  The representative did not provide such assurances.  To the contrary, the official said in writing that "we will not give any assurances about potential future enforcement."

3.      Federal law preempts Iowa from subjecting Kalshi to state law.  Preemption exists under straightforward principles of express preemption, field preemption, and conflict preemption. This Court should therefore grant Kalshi injunctive and declaratory relief on preemption grounds.

4.      Kalshi is a federally designated derivatives exchange, subject to the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a). It offers consumers the opportunity to trade in many types of event contracts. These contracts are subject to exclusive federal oversight, and—critically—they are *lawful* under federal law.

5.      Commodity futures regulation has long been under the exclusive purview of the federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal agency called the CFTC to oversee it.

6.      The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs." The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). During the drafting of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 50 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). As the conference report to the 1974 amendments explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). And the statute gives the CFTC comprehensive authority over regulated exchanges,

including the authority to approve or reject certain categories of event contracts as against the public interest.

7.    For that reason, courts have easily found that the CEA preempts state laws in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563–64 (6th Cir. 1998).

8.    Commentators have likewise concluded with no difficulty that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). And commentators have specifically recognized that "the CEA preempts state bucket-shop laws and other anti-gambling legislation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).

9.    The CFTC itself agrees. It recently informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583 (emphasis added). Just last month, the CFTC affirmed that it has exclusive jurisdiction to regulate derivatives markets like Kalshi, and it defended that authority against improper attacks from state regulators such as Iowa's. Amicus Brief of CFTC at 1, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2, at 1 ("CFTC Amicus Br.") ("Congress vested the CFTC with exclusive jurisdiction to protect that national interest by overseeing the regulation of futures, options, and swaps traded on federally regulated exchanges…[t]he *CFTC's jurisdiction supersedes State as well as Federal agencies* because commodity derivatives markets require nationally uniform rules

governing the listing, trading, clearing, settlement, surveillance, and enforcement of financial instruments traded in these markets to prevent the type of fragmented oversight" that would result from state enforcement) (citation modified) (emphasis added).

10.    Multiple courts have agreed that the CEA preempts state law as to Kalshi's contracts.  Last month, the U.S. District Court for the Middle District of Tennessee granted Kalshi a preliminary injunction barring officials in that state from taking action against Kalshi's exchange. *KalshiEX v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026).  The court concluded "that Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies." *Id.*  The court further concluded that Kalshi would suffer irreparable harm because its constitutional rights were threatened and because "[a]bsent an injunction, Kalshi could either continue its operations in Tennessee and face potential civil and criminal liability" or attempt to comply and risk its position as a national exchange. *Id.* at *10. The court further noted that Kalshi would be irreparably injured from the "substantial expenses and reputational harm" it would incur from attempting to comply with Tennessee's unconstitutional demands. *Id.* at *11.

11.    The U.S. District Court for the District of New Jersey likewise granted Kalshi's preliminary injunction in April 2025.  The court enjoined state officials from attempting to prohibit Kalshi's event contracts, explaining that it was "persuaded [] Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi.  *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025).  Moreover, the court recognized that even the "express preemption provisions" of 7 U.S.C. § 16 "do[] not foreclose implied preemption elsewhere within the CEA." *Id.* at *5.  In ruling for Kalshi, the court

emphasized that even if Kalshi's contracts were "unlawful" under federal law "that would subject Kalshi to the review of the CFTC—not state regulators." *Id.*, at *5. The court also found that Kalshi faced irreparable harm because:

> [T]he prospect of facing civil or criminal enforcement or complying and compromising the integrity of its contracts imperils the reputation Kalshi has cultivated over several years . . . at minimum—Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial.

*Id.* at *7 (describing the circumstances as a "Hobson's choice" for Kalshi where "leaving it subject to state enforcement or obligating it to shift its business practices [are] consequences that are not cleanly undone").

12.    While some courts have found that the CEA does not prevent states from barring Kalshi's event contracts, those decisions are mistaken and have been appealed. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282 (D. Nev. Nov. 24, 2025); *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, slip op. (S.D. Ohio Mar. 9, 2026).

13.    Even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants have made clear that they (mistakenly) believe that Kalshi's contracts are instead subject to—and unlawful under—Iowa law. In her official capacity as Iowa's Attorney General and on behalf of the State of Iowa, Defendant Bird signed multiple amicus briefs that claim Kalshi is violating comparable state laws by offering sports event contracts. *See generally* Brief of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29 ("June Amicus"); Brief of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41-1 ("December Amicus"); Brief of Amici Curiae, *KalshiEX LLC v. Hendrick*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1 ("January Amicus"); Brief of Amici Curiae, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Mar. 10, 2026), Dkt. No. 76.1 ("March

Amicus"). Those amicus briefs argue that states, not the CFTC, have the sole power to regulate Kalshi's sports event contracts. *Id.* And although those cases were focused particularly on Kalshi's sports event contracts, the positions advanced by the amicus could apply to **all** of Kalshi's contracts. CFTC Amicus Br. at 2-3. 17–18, 28–29 (explaining that arguments advanced by states in attempting to regulate sports event contracts apply beyond sports events, and this conduct improperly usurps the CFTC's exclusive authority while causing "market fragmentation [that] erode[s] the nationally uniform framework Congress established to reduce risk, promote transparency, and safeguard market integrity within the financial system.").

14.     Iowa state laws subject unlawful gaming transactions to civil and criminal penalties. *See* Iowa Code chapters 99, 99A, 99B, 99D, 99E, 99F, 99G, 725. Defendant Bird's March 4, 2026 meeting with Kalshi makes abundantly clear that she believes Kalshi's event contracts constitute unlawful gaming. Defendant Bird's statements accordingly make clear that Kalshi is at risk of civil or even criminal enforcement in Iowa.

15.     Defendants' anticipated actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law. Kalshi is entitled to declaratory and injunctive relief to prevent Iowa authorities from enforcing their preempted state laws against Kalshi.

16.     Accordingly, Defendants' anticipated actions threaten impending and irreparable harm, not just to Kalshi, but to its customers and commercial counterparties. Shutting down Kalshi's ability to offer event contracts in Iowa would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear. It would also impair Kalshi's existing contracts with consumers and business partners, subject

Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten its prospective business relationships, and jeopardize its status as a CFTC-approved exchange. For these reasons, Kalshi intends to seek injunctive relief to avoid the immediate and irreparable harm that would result if Defendants were to commence an enforcement action.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether Iowa law is preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

18.     The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. Under the Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123, 159-160 (1908), "a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).

19.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). Defendants perform their duties in and thus reside in this District. A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

20.     Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

21.     Defendant Brenna Bird is sued in her official capacity as the Attorney General of Iowa ("Iowa AG").

22.     Defendant Tina Eick is sued in her official capacity as Administrator of the Iowa Racing & Gaming Commission.

23.     Defendant Amy Burkhart is sued in her official capacity as Chair of the Iowa Racing & Gaming Commission.

24.     Defendant Daryl Olsen is sued in his official capacity as Vice Chair of the Iowa Racing & Gaming Commission.

25.     Defendant Michael Boal is sued in his official capacity as Member of the Iowa Racing & Gaming Commission.

26.     Defendant Alan Ostergren is sued in his official capacity as Member of the Iowa Racing & Gaming Commission.

27.     Defendant Iowa Racing and Gaming Commission ("IRGC" or the "Commission") is sued as the state agency that regulates gaming in the State of Iowa by licensing or permitting all individuals and entities that are involved with legalized gambling and sports wagering, and by monitoring and educating to ensure compliance with Iowa's gaming laws.  As the state's gaming regulator, the Commission has jurisdiction over all persons involved in legal gaming.

28.     Together, defendants Bird, Eick, Burkhart, Olsen, Boal, Ostergren, and IRGC would be responsible for enforcing any demand for Kalshi to comply with Iowa state law that is preempted by federal law.

## **FACTUAL ALLEGATIONS**

A.    **An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.**

29.    Derivatives contracts are financial tools used to mitigate risk.  Event contracts are a quintessential example of a derivatives contract—they are a type of option.  This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date.  Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position.  For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2026.  A purchaser may trade on either the "yes" or the "no" position on the contract.  If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

30.    Event contracts are traded on an exchange.  Traders exchange positions with other traders in the marketplace.  Importantly, event contracts do not reflect a "bet" against the "house."  Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").  Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

31.    The value of an event contract is determined by market forces.  An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence.  During that period, individuals can buy and sell the contract at its fluctuating prices.  The ultimate value of an event

contract is determined at its expiration date.  If the underlying event occurs, the holder of the "yes" position is entitled to its full value.  But if the underlying event does not occur, the holder of the "no" position gets the payment.

32.    Traders price event contracts by reference to available information at any given time.  If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase.  The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur.  Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year.  The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

33.    Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other widely available financial instrument with this unique capability to capture the risks of an event with potential economic consequences, which is a benefit not only to those that wish to hedge risk or seek return, but also to market observers and other economic actors.

34.    To give just some of many examples, last month, researchers at the Federal Reserve published a paper for which the "results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers."[1]   Findings in that paper included that "Kalshi markets are well-behaved and

---

[1] Anthony M. Diercks, Jared Dean Katz & Jonathan H. Wright, *Kalshi and the Rise of Macro Markets*, Finance and Economics Discussion Series Paper 2026-010, Board of Governors of the

broadly consistent with those from more established financial instruments," and that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."[2] Further, Kalshi's "median and mode have a perfect forecast record on the day before the [Fed Open Market Committee] meeting, which represents a statistically significant improvement over the fed funds futures forecast,"[3] and, for headline consumer price index forecasts, "Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast."[4] And, "Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options data have historically been unavailable."[5]

35.    As another example, Kalshi recently announced a partnership with Tradeweb, a leading global operator of electronic marketplaces for rates, credit, equities, and money markets, which facilitates more than $2.6 trillion in notional value of instruments traded per day.[6] The partnership is designed to expand institutional access to data from Kalshi's market and to facilitate trading by those same institutional investors on Kalshi's platform.[7]

---

Federal Reserve System, at 1 (Feb. 18, 2026), https://www.federalreserve.gov/econres/feds/kalshi-and-the-rise-of-macro-markets.htm.

[2] *Id.* at 2-3.

[3] *Id.* at 3.

[4] *Id.*

[5] *Id.*

[6] Tradeweb and Kalshi Announce Strategic Partnership to Expand Institutional Access to Prediction Markets, Tradeweb (Feb. 19, 2026), https://www.tradeweb.com/newsroom/media-center/news-releases/tradeweb-and-kalshi-announce-strategic-partnership-to-expand-institutional-access-to-prediction-markets/.

[7] *See* Katherine Doherty and Sridhar Natarajan, *Wall Street Bond-Trading Hub Tradework Strikes Deal with Kalshi*, Bloomberg (Feb. 19, 2026), https://www.bloomberg.com/news/articles/2026-02-19/bond-trading-hub-tradeweb-strikes-prediction-markets-deal-with-kalshi.

36.    Late last year, the real estate investment firm Arrived announced its plans to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[8]

37.    Sporting events can have significant economic consequences for a broad ecosystem of stakeholders.  *Orgel*, 2026 WL 474869, at *7–10; *Flaherty*, 2025 WL 1218313, at *6; CFTC Amicus Br. at 19-20.  Advertisers, sponsors, television networks, local communities, sportsbooks, and others all stand to gain or lose substantial sums depending on sports events.  Sports event contracts offer these entities opportunities to hedge their exposure.  And that is happening in the market right now.

38.    Take, for example, Game Point Capital, a sports-focused insurance firm that works with college athletic departments, pro teams, and sponsors to insure risk related to performance bonuses, coach salary buyouts, postseason and ticket revenue, and other areas of economic exposure.[9]  Game Point Capital uses Kalshi to hedge, and it intends to do so for $30 million in risk annually.[10]

---

[8] *See* Ryan Frazier, LinkedIn, https://www.linkedin.com/posts/activity-7386091007588749312-rhxN/ [https://perma.cc/CQN6-JK3M]; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round*, N.Y. Times (Dec. 2, 2025), https://www.nytimes.com/2025/12/02/business/dealbook/kalshi-prediction-market-billion.html [https://perma.cc/VUY8-HCDT].

[9]*Services*, Game Point Capital, https://www.gamepointcapital.com/services; *see also* Paul Steinbach, *UConn Insured Basketball Coach Bonuses and Saved Nearly $3M*, Athletic Bus. (Apr. 23, 2024), https://www.athleticbusiness.com/operations/budgeting/article/15669200/uconn-insured-basketball-coach-bonuses-and-saved-nearly-3m (Game Point Capital wrote insurance contract that saved university nearly $3 million in bonus payments to coaches related to NCAA tournament performance).

[10] Andrew Ross Sorkin et al., *New Epstein Details Rattle Washington, Hollywood and Beyond*, N.Y. Times (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html.

39.     Likewise, Underdog Sports, a fantasy sports company, uses Kalshi as a tool to "hedge against volatility" on its own platform.[11]

40.     Others can use sports event contracts to hedge as well:  Sponsors of a team or athlete can use event contracts to hedge against the risk that the team or athlete underperforms.  Hotel operators can hedge against the revenue earned from a local team making a playoff run, and TV networks can hedge against the risk that star players who draw viewers may not play in certain games.

41.     Event contracts are also a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions.  Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions.  This is not theoretical.  Kalshi has recently announced partnerships with CNN and CNBC, which make use of its market data in their reporting.[12]

42.     Kalshi has recently launched a platform, Kalshi Research, to share market data with academics and promote research derived from the same.[13] Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or

---

[11] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 20, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/.

[12] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Business Insider (Dec. 4, 2025), https://www.businessinsider.com/kalshi-cnbc-deal-cnn-data-integration-partnership-2025-12; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block (Dec. 4, 2025), https://www.theblock.co/post/381415/kalshi-exclusive-cnbc-deal-prediction-markets-surge-mainstream-media.

[13] *See Kalshi launches new research arm*, Kalshi News (Dec. 22, 2025), https://news.kalshi.com/p/kalshi-launches-research-arm-prediction-markets.

non-occurrence of the underlying event.  *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B.    Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.**

43.    Futures contracts have long been regulated by the federal government.  In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

44.    In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA.  Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures exchanges to "conflicting regulatory demands."  *Am. Agric. Movement*, 977 F.2d at 1156.  One Senator remarked that "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).  As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974).  The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading.  *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).

45.    The CFTC regulates derivatives that reference physical commodities like "wheat, cotton, rice, corn, oats."  7 U.S.C. § 1a(9).  The CFTC also regulates derivatives on intangible "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk

metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).

46.    In 2010, Congress amended the CEA to add "swaps" to the CFTC's exclusive jurisdiction and to define event contracts as a type of swap. *See id.* § 1a(47)(A)(ii), (iv), (vi); *KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).

47.    The CFTC has also recognized that "event contracts," including contracts on the "outcome of particular entertainment events," "can be designed to exhibit the attributes of either options or futures contracts." *Concept Release*, 73 Fed. Reg. 25,669, 25,669–70 (May 7, 2008). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane. Where event contracts pay out based on financially significant occurrences, they are "of the character of" futures and options, as understood by derivatives markets. *See id.* § 1a(36) (defining "option").

48.    Also, in 2010, Congress amended the CEA to add a "Special Rule" governing event contracts. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

**C.**     **Entities That Offer Event Contracts Must Comply with the Comprehensive Regulatory Framework Established by the CEA and CFTC.**

49.     The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM.  7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a).  An entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA.  17 C.F.R. § 38.3(a)(2).  Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation.  17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.  Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA.  17 C.F.R. § 38.3(a)(2).  The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission.  17 C.F.R. § 38.3(a)(1).

50.     Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market.  Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).  This exclusive jurisdiction extends to "event" contracts.  *See id.* § 1a(47)(A)(ii), (iv), (vi).

51.     The CFTC engages in significant oversight over DCMs.  Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that

17

these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain their DCM designation. 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

52.    The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC. To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c). The CFTC also may require a DCM to submit a "written demonstration" that it is "in compliance" with one or more Core Principles at any time. 17 C.F.R. § 38.5(b).

53.    Alternatively, exchanges have the option of submitting contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B). Substantially all contracts listed by DCMs for trading are self-certified by the listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

*54.*    The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs. The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC,

pursue enforcement actions in federal court or administrative proceedings.   If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2) restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and trading privileges, and (5) injunctions or cease-and-desist orders.   *See* CFTC Division of Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966, at § 3.3. If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution.   *Id.*

**D.    After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.**

55.    Kalshi is a CFTC-regulated exchange and prediction market where users can trade on the outcome of real-world events.   In 2020, the CFTC designated Kalshi as a contract market, affirming that its platform complied with the CEA.   Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

56.    Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

57.    Kalshi offers many kinds of event contracts related to an array of substantive areas like economics, finance, climate, technology, health, crypto, popular culture, and sports.   For example, Kalshi's platform currently allows users to trade on the level of US GDP growth in Q1 2026, the closing price of the S&P 500 at the end of 2026, whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030.   Kalshi also offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events,

technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

58.     Prior to making a contract available for trade on its platform, Kalshi self-certifies to the CFTC, pursuant to section 7a-2(c)(1) of the CEA, that the offering complies with the CEA and CFTC regulations.   Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review.

59.     The CFTC also may require Kalshi to submit a "Demonstration of Compliance," which is "a written demonstration, containing supporting data, information and documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request."  17 C.F.R. § 38.5(b).  The CFTC did just that with respect to Kalshi's first sports event contracts, and Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports event contracts traded on DCMs.

60.     The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed, with no hint that the agency views these contracts as falling outside of its jurisdiction.  Had the CFTC deemed Kalshi's sports event contracts (or any other of its contracts) impermissible, it would have had the responsibility to "object[]" to the contracts. 7 U.S.C. § 7a-2(c)(3)(B)(ii).  But it did not.  Unless and until the CFTC takes action on a self-certified Kalshi contract—and they all have been self-certified—the contracts are authorized under federal law.  7 U.S.C. § 7a-2(c)(5).

**E.    Defendant Bird Asserted that Kalshi's Event Contracts Violate State Gambling Laws.**

61.     On March 4, 2026, Kalshi's Director of State Relations met with Defendant Bird in her official capacity as Iowa's AG.  The meeting was framed as an introduction to Kalshi and prediction markets, with a request for Defendant Bird's thoughts on a bill pending in the Iowa

legislature regarding the taxation of DCMs like Kalshi.  But, to the surprise of Kalshi's representative, the meeting was more akin to, in Defendant Bird's words, a "deposition" at which Iowa's Solicitor General, along with several Iowa AG staffers, pressed the representative with questions suggesting a belief that they viewed Kalshi as offering sports gaming and gambling in violation of Iowa law.  Following the meeting, Defendant Bird confirmed as much, stating that the Iowa AG's office had been "looking at" Kalshi "for a long time."

62.    Alarmed by the tenor of the meeting, on March 10, 2026 Kalshi contacted a representative of the Iowa AG to request assurances that Defendants did not intend to bring an enforcement action against Kalshi.  The representative declined to do so and said, in writing, the opposite: "[W]e will not give any assurances about potential future enforcement."

63.    Iowa regulates gaming and gambling through its civil and criminal code.  *See* Iowa Code Ann. chapters 99, 99A, 99B, 99D, 99E, 99F, 99G, 725.  Iowa's criminal statutes prohibit "illegal gaming" or "bookmaking," unless an entity has obtained a license from the IRGC in accordance with chapters 99B, 99D, 99E, or 99F of the code.  Iowa defines "bookmaking" as "advancing gambling activity by accepting bets upon the outcome of future contingent events as a business other than as permitted in chapters 99B, 99D, 99E, and 99F."  Iowa Code Ann. § 725.13.  Violations of Iowa's anti-gaming and anti-gambling laws constitute misdemeanors and felonies, which are punishable by up to ten years imprisonment.  *See, e.g.*, *id.* §§ 725.7(2)(a)(1); 725.7(d); 902.9; 903.1.

64.    In light of the nature of the March 4, 2026 meeting with Kalshi's Director of State Relations, and Defendants' refusal to provide assurances regarding an enforcement action against Kalshi, there is a substantial risk that Iowa intends to take either civil or criminal action against Kalshi.

## REQUISITES FOR RELIEF

65.　　As a result of Defendants' threatened conduct described above, there is a strong likelihood that Defendants will take action, including, but not limited to, the enforcement of preempted state law threatened by Defendants' statements, which will violate the Supremacy Clause of the U.S. Constitution, and will subject Kalshi and its customers to irreparable harm.

66.　　An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties.  Defendants' conduct has already resulted in, and will continue to result in, irreparable injury to Plaintiff, including but not limited to economic hardship and impairment of existing contractual relationships.

67.　　Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein.  Plaintiff therefore seeks declaratory and injunctive relief restraining Defendants from enforcing Iowa law that interferes with the operation and function of Plaintiff's futures market described herein.

## COUNT I
## (Supremacy Clause—Preemption by Commodity Exchange Act)

68.　　Plaintiff incorporates all prior paragraphs by reference.

69.　　The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

70.　　The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

71.     Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings, at 685 (statement of Sen. Clark).  Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges.  *See, e.g.*, *Am. Agric. Movement*, 977 F.2d at 1156; *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

72.     In threatening to enforce Iowa's anti-gambling laws against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges.  Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter.  Because federal law occupies the entire field of regulating trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

73.     In addition, Defendants' threatened actions conflict with federal law and policy.  Defendants seek to ban event contracts that the CFTC has opted to authorize (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate DCMs.  If Kalshi were forced into compliance with Iowa law, it could be forced to comply with 49 other states' laws, producing the patchwork of state-by-state regulation Congress in the CEA sought to prohibit.  And because federal law requires Kalshi

to offer impartial access to its exchange, compliance with Iowa law would jeopardize Kalshi's compliance with the federal obligations to which it is subject.  For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

74.    Defendants may not enforce Iowa's anti-gaming and anti-gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1.    Enter a judgment declaring that Iowa Code chapters 99, 99A, 99B, 99D, 99E, 99F, 99G, 725, and any other Iowa law that is used in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2.    Enter an injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Iowa Code chapters 99, 99A, 99B, 99D, 99E, 99F, 99G, 725, or any other Iowa law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff;

3.    Any other relief within this Court's discretion that it deems just and proper.

DATED: March 11, 2026

Respectfully submitted,

WEINHARDT & LANTZ, P.C.

By: /s/ Mark E. Weinhardt

| Mark E. Weinhardt | AT0008280 |
| Andrew J. Graeve | AT0015662 |
| Jason R. Smith | AT0014862 |

2600 Grand Avenue, Suite 450
Des Moines, IA 50312
Telephone: (515) 244-3100
mweinhardt@weinhardtlantz.com
agraeve@weinhardtlantz.com
jsmith@weinhardtlantz.com

and

MILBANK LLP

Neal Kumar Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
nkatyal@milbank.com
jsterling@milbank.com
whavemann@milbank.com

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
gmainland@milbank.com
aporter@milbank.com

*Attorneys for Plaintiff KalshiEX LLC*

4935-3442-6518, v. 3