**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| KALSHIEX LLC,<br><br>  *Plaintiff,*<br><br>  v.<br><br>BRENNA BIRD, in her official capacity as Attorney General of Iowa; the IOWA RACING & GAMING COMMISSION; TINA EICK, in her official capacity as Administrator of the Iowa Racing & Gaming Commission; AMY BURKHART, in her official capacity as Chair of the Iowa Racing & Gaming Commission; DARYL OLSEN, in his official capacity as Vice Chair of the Iowa Racing & Gaming Commission; MICHAEL BOAL, in his official capacity as Member of the Iowa Racing & Gaming Commission; ALAN OSTERGREN, in his official capacity as Member of the Iowa Racing & Gaming Commission,<br><br>  *Defendants.* | Case No. 4:26-cv-109-SHL-HCA<br><br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

<u>**Page**</u>

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ............................................................................................................... 2

    I.    Iowa Regulates Sports Wagering Under Its Longstanding Police Power. ........................ 2

    II.    Federal Gambling Laws Defer to State Gambling Policies. ............................................... 3

    III.    Congress Amends the CEA in Response to the 2008 Financial Crisis. ............................. 4

    IV.    Kalshi Offers Sports Event Contracts on Its Designated Contract Market. ........................ 6

LEGAL STANDARD ....................................................................................................... 8

ARGUMENT ................................................................................................................... 8

    I.    Kalshi Is Not Likely To Succeed On The Merits. .............................................................. 8

        A.  Kalshi lacks standing to seek sweeping relief against entire Code chapters. .............. 8

**TABLE OF CONTENTS (cont'd)**

<u>**Page**</u>

    B.  Kalshi cannot sue under the *Ex Parte Young* exception to sovereign immunity......... 10

    C.  The Commodity Exchange Act Does Not Preempt Iowa's Gambling Laws. ............. 11

II.   The Other Factors Weigh Against Plaintiff's Requested Relief........................................ 24

III.  Plaintiff Must Post a Rule 65(c) Injunction Bond Before Any Injunction Takes Effect.. 25

CONCLUSION................................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*,
977 F.2d 1147 (7th Cir. 1992) .................................................................................. 16, 21

*Bloomberg L.P. v. CFTC*,
949 F. Supp. 2d 91 (D.D.C. 2013).................................................................................... 5

*BNSF Ry. Co. v. Hiett*,
22 F.4th 1190 (10th Cir. 2022) ...................................................................................... 17

*Bond v. United States*,
572 U.S. 844 (2014) ....................................................................................................... 14

*Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*,
468 U.S. 491 (1984) ....................................................................................................... 23

*CG Tech. Dev., LLC v. 888 Holdings, PLC*,
2022 WL 605430 (D. Nev. Mar. 1, 2022) ..................................................................... 24

*DTCC Data Repository (U.S.) LLC v. CFTC*,
25 F. Supp. 3d 9 (D.D.C. 2014)....................................................................................... 5

*E.E.O.C. v. HBE Corp.*,
135 F.3d 543 (8th Cir. 1998) ......................................................................................... 23

*Eggers v. Evnen*,
48 F.4th 561 (8th Cir. 2022) .......................................................................................... 24

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) .................................................................................................... 18, 19

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ....................................................................................................... 13

*Ex parte Young,* 209 U.S. 123 (1908) ............................................................................... 10

*Filyaw v. Corsi*,
150 F.4th 936 (8th Cir. 2025) ........................................................................................ 10

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995) ....................................................................................................... 17

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
  486 F.3d 430 (8th Cir. 2007) ....................................................................... 2, 3, 15

*Hencely v. Fluor Corp.*,
  146 S. Ct. 1086 (2026) .......................................................................................... 20

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017) ................................................................................................ 21

*Hershey v. Jasinski*,
  86 F.4th 1224 (8th Cir. 2023) ............................................................................. 9, 10

*Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016)....................................... 17

*KalshiEX LLC v. CFTC*,
  119 F.4th 58 (D.C. Cir. 2024) ................................................................................. 6

*KalshiEX, LLC v. Flaherty*,
  172 F.4th 220 (3d Cir. 2026) ................................................................................. 17

*KalshiEX, LLC v. Hendrick*,
  817 F. Supp. 3d 1014 (D. Nev. 2025).............................................. 8, 12, 13, 14, 15, 24

*KalshiEX LLC v. Johnson*,
  2026 WL 1223373 (D. Ariz. May 5, 2026) ........................................................... 17

*KalshiEX LLC v. Martin*,
  793 F. Supp. 3d 667 (D. Md. 2025).......................................................... 8, 16, 18, 22

*KalshiEX LLC v. Orgel*,
  2026 WL 474869 (M.D. Tenn. Feb. 19, 2026).................................................... 17

*KalshiEX, LLC v. Schuler*,
  2026 WL 657004 (S.D. Ohio Mar. 9, 2026).............................................. 7, 13, 14

*KalshiEX LLC v. Schuler*,
  2026 WL 1295806 (6th Cir. Apr. 24, 2026) ................................. 6, 7, 15, 16, 17, 21, 23, 24, 25

*KalshiEX, LLC v. State of Nev. Gaming Control Bd.*, No. 92771 (Nev. July 1, 2026) ................. 24

*KalshiEX LLC v. Williams*,
  2026 WL 1961872 (S.D.N.Y. July 7, 2026) ....................................... 8, 16, 21, 23, 24

*Kansas v. Garcia*,
  589 U.S. 191 (2020) ............................................................................... 18, 19, 20

iii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Kerr v. First Commodity Corp. of Boston,*
  735 F.2d 281 (8th Cir. 1984) ............................................................... 15

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ........................................................................... 19

*Merck Sharp & Dohme Corp. v. Albrecht,*
  587 U.S. 299 (2019) ...................................................................... 20, 21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
  456 U.S. 353 (1982) ........................................................................ 4, 5

*Minn. Chapter of Associated Builders & Contractors v. Ellison,*
  153 F.4th 695 (8th Cir. 2025) ....................................................... 10, 11

*Minn. RFL Republican Farmer Lab. Caucus v. Freeman,*
  33 F.4th 985 (8th Cir. 2022) ............................................................... 11

*Monroe v. Ark. State Univ.,*
  495 F.3d 591 (8th Cir. 2007) .............................................................. 10

*Morales v. TransWorld Airlines, Inc.,*
  504 U.S. 374 (1992) ........................................................................... 24

*Murphy v. NCAA,*
  584 U.S. 453 (2018) .................................................................. 2, 4, 25

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ......................................................................... 8, 10

*N. Am. Derivatives Exch., Inc. v. Nev. ex rel. Nev. Gaming Comm'n,*
  815 F. Supp. 3d 1169 (D. Nev. 2025) ..................................... 5, 8, 12, 14

*Novus Franchising, Inc. v. Dawson,*
  725 F.3d 885 (8th Cir. 2013) .............................................................. 24

*Oneok, Inc. v. Learjet, Inc.,*
  575 U.S. 373 (2015) ...................................................................... 15, 18

Opinion and Order Denying Plaintiff's Motion for a Preliminary Injunction, *Robinhood Derivatives, LLC v. Nessel*, No. 1:26-cv-730 (W.D. Mich. June 17, 2026) .......................... 8, 14

*Pharm. Rsch. & Mfrs. of Am. v. McClain,*
  95 F.4th 1136 (8th Cir. 2024) ..................................................... 15, 20, 21

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Planned Parenthood Minn., N.D., S.D. v. Rounds,*
  530 F.3d 724 (8th Cir. 2008) ................................................................ 8, 24

*QCX LLC v. Nessel,*
  2026 WL 1895958 (W.D. Mich. June 17, 2026) .................................. 8, 14

*R. J. Reynolds Tobacco Co. v. City of Edina,*
  60 F.4th 1170 (8th Cir. 2023) ...................................................................... 20

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs,*
  826 F.3d 1030 (8th Cir. 2016) ..................................................................... 25

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) .................................................................................... 25

*United States v. Evans,*
  175 F.4th 950 (8th Cir. 2026) ...................................................................... 24

*Va. Uranium, Inc. v. Warren,*
  587 U.S. 761 (2019) .................................................................................... 20

*Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark,*
  310 U.S. 32 (1940) ...................................................................................... 24

*West Virginia v. EPA,*
  597 U.S. 697 (2022) .................................................................................... 14

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) .................................................................................... 14

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) .......................................................................................... 8

*Wyeth v. Levine,*
  555 U.S. 555 (2009) .................................................................................... 21

**Statutes**

7 U.S.C. § 1a ............................................................................... 5, 12, 13, 14, 15

7 U.S.C. § 2 ...................................................................................... 5, 11, 15, 16, 17

7 U.S.C. § 7 .................................................................................................... 22

7 U.S.C. § 7a-2 ............................................................................... 6, 16, 19, 20, 22

7 U.S.C. § 13a-2 ........................................................................................... 15, 18

**TABLE OF AUTHORITIES (cont'd)**

<u>**Page(s)**</u>

7 U.S.C. § 16 ................................................................................................................ 16

7 U.S.C. § 27f ............................................................................................................... 16

15 U.S.C. § 1172 ............................................................................................................. 4

15 U.S.C. § 3001 ............................................................................................................. 3

15 U.S.C. § 3002 ............................................................................................................. 4

15 U.S.C. § 3003 ............................................................................................................. 4

18 U.S.C. § 1084 ............................................................................................................. 4

18 U.S.C. § 1955 ............................................................................................................. 4

25 U.S.C. § 2710 ............................................................................................................. 4

28 U.S.C. § 3701 ............................................................................................................. 4

31 U.S.C. § 5361 ........................................................................................................... 18

31 U.S.C. § 5362 ....................................................................................................... 4, 18

Act of May 13, 2019, 2019 Iowa Acts ch. 132 ............................................................. 3

Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 .......... 5

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) .................................................................................................. 5

Iowa Code § 80.25A ....................................................................................................... 3

Iowa Code § 99.1A ......................................................................................................... 9

Iowa Code § 99D.5 .................................................................................................... 3, 10

Iowa Code § 99D.7 .................................................................................................... 9, 11

Iowa Code § 99E.3 ................................................................................................. 3, 9, 11

Iowa Code § 99F.4 ............................................................................................... 9, 11, 22

Iowa Code § 99F.7A .................................................................................................. 9, 22

Iowa Code § 99F.9 ..................................................................................................... 9, 22

**TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

Iowa Code § 99F.11 ............................................................................................ 22

Iowa Code § 99F.12 ............................................................................................ 22

Iowa Code § 99F.15 ............................................................................................ 22

Iowa Code § 725.7 ................................................................................................ 3

Iowa Code § 725.8 .............................................................................................. 25

Iowa Code § 725.13 ........................................................................................ 3, 12

Iowa Const. art. III, § 28 ...................................................................................... 2

Iowa Const. of 1846 art. III, § 29 ......................................................................... 2

Professional and Amateur Sports Protection Act, Pub. L. No. 102-559, 106 Stat. 4227 (1992) .... 4

**Rules**

Fed. R. App. P. 41 .............................................................................................. 25

Fed. R. Civ. P. 65 ............................................................................................... 25

**Regulations**

17 C.F.R. § 38.151 .............................................................................................. 22

17 C.F.R. § 40.11 .................................................................................... 6, 19, 22

Core Principles and Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80,572 (Dec. 22, 2010) ........................................................................................ 22, 23

Further Definition of "Swap," 77 Fed. Reg. 48,208 (Aug. 13, 2012) ........................................ 14

Iowa Admin. Code rs. 491-13.2–.3, 13.5 ................................................................... 3

**Other Authorities**

156 Cong. Rec. S5906–07 (July 15, 2010) ................................................................. 6

Brief of Appellee, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024). .............. 7, 13

CFTC, *Contracts & Products* ................................................................................. 6

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Chinmay Vaidya, *Kalshi Sports Prediction Markets See Over $300 Million Traded on 2026 World Cup*, CBS Sports (June 17, 2026) ................................................................... 7

David Purdum, *Bettors Raising Stakes on What Super Bowl Announcers Say*, ESPN (Feb. 2, 2026) ......................................................................................................................... 7

Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026) ....................................................................................................... 7

Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2025) ................................................................................................................. 1, 6, 7

Grant Mitchell, *Kalshi, Prediction Markets Stealing Market Space from Top Sportsbooks*, Covers (Feb. 16, 2026) ................................................................................................... 7

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) ............................................................... 17

Iowa Racing & Gaming Comm'n, *Commission History* .................................................. 3

*Kalshi Retreats from India While European Regulators Target Prediction Markets*, Public Gaming (June 23, 2026) ................................................................................................. 24

Legislative Services Agency, *Legislative Guide to Gambling in Iowa* (2002) ............................... 2

Legislative Services Agency, *Update on Iowa's Gaming Industry and Associated Revenues* (2025) ........................................................................................................................ 2

States have long regulated gambling under their core police powers. The Iowa Constitution banned gambling until 1972, then Iowa permitted gambling on a highly regulated basis. *See, e.g.*, Iowa Code Chapter 99F. That reflects the Legislature's judgment on how to allow gambling while protecting Iowans' health and welfare, ensuring sports integrity, and providing State revenue. Meanwhile, federal gambling policy has mostly been to reinforce State law, with federal law generally permitting gambling in States that allow it and prohibiting it in States that do not.

KalshiEX LLC describes itself here as a "derivatives exchange and prediction market" on which users can trade "event contracts," Dkt. 1 (Compl.) ¶ 20, but elsewhere as a sports-betting platform: "Sports Betting Legal in all 50 States on Kalshi." Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2025), https://perma.cc/MS5G-95HV.

In 2025, Kalshi began offering what it calls "sports event contracts." Dkt. 20-1 at 7–8. And those contracts operate like sports bets: Participants—including those with nothing at stake in the sporting event and therefore no financial risk to hedge—can purchase either a "yes" or "no" position on any number of sports-related questions, from whether a team will win a particular game to how many points a player will score or even whether the broadcasters will mention particular words or phrases. Participants who pick correctly get paid out. Participants who pick wrong lose.

Kalshi does not comply with state gambling laws and has sued several States to enjoin them from enforcing against it. Kalshi claims that the Commodity Exchange Act—specifically amendments added by Dodd-Frank in 2010—preempts all state gambling laws as applied to event contracts. Dodd-Frank added "swaps"—a new financial instrument in which participants exchange risk—to the Commodity Futures Trading Commission's ("CFTC") exclusive jurisdiction, and—through a law designed to ensure the CEA would not be used as a loophole for evading gambling laws—authorized CFTC to prohibit certain types of event contracts on public-interest grounds.

Kalshi filed a pre-enforcement suit to enjoin Iowa Attorney General Brenna Bird, the Iowa Racing and Gaming Commission ("IRGC"), and IRGC's administrator and members from enforcing several gambling-related Iowa Code chapters against Kalshi. Dkt. 1 at 24. Kalshi moved for a preliminary injunction. Dkt. 20. This Court should deny the preliminary injunction.

1

*First*, Kalshi is not likely to succeed on the merits. Kalshi lacks standing for the sweeping relief it seeks. Kalshi also has no cause of action under *Ex parte Young*, so Defendants are immune from suit. Kalshi cannot use *Ex parte Young* to sue IRGC. And neither Attorney General Bird nor IRGC officials are imminently about to enforce against Kalshi.

The CEA does not preempt Iowa's gambling laws as applied to Kalshi. Kalshi's sports event contracts are not "swaps," so CFTC does not have exclusive jurisdiction over them. And even if they are "swaps," the CEA does not provide an end run around State regulations. The CEA does not preempt the field of futures markets, much less sports event contracts. The CEA's preemption, non-preemption, and savings clauses confirm that sweeping field preemption is improper here. Nor does conflict preemption apply. Iowa's laws further the CEA's objectives. And Kalshi can comply both with the CEA and Iowa law.

*Second*, the remaining factors favor Defendants. Kalshi cannot show imminent enforcement and thus fails to establish irreparable harm. That alone is enough to defeat the request for an injunction. Meanwhile, the State always suffers irreparable harm when its laws' enforcement is enjoined, especially when those laws are designed to protect Iowans' health and welfare.

This Court should deny Kalshi's motion for a preliminary injunction.

## BACKGROUND

### I.   Iowa Regulates Sports Wagering Under Its Longstanding Police Power.

States have long regulated gambling as a core exercise of their police powers. *See Murphy v. NCAA*, 584 U.S. 453, 458–60 (2018); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439 (8th Cir. 2007). Iowa has either prohibited or heavily regulated gambling since 1846, when its first Constitution barred gambling entirely. *See* Iowa Const. of 1846 art. III, § 29; Iowa Const. art. III, § 28 (repealed 1972). Since the constitutional section prohibiting gambling was repealed in 1972, Iowa has legalized various forms of gambling, including bingo, raffles, pari-mutuel wagering at horse races, the lottery, excursion boat gambling, fantasy sports, and land-based casinos. *See* Legislative Services Agency, *Legislative Guide to Gambling in Iowa* 1–2 (2002), https://perma.cc/SM8T-UBFF; Legislative Services Agency, *Update on Iowa's Gaming*

*Industry and Associated Revenues* 3 (2025), https://perma.cc/FG2N-5DFW; Iowa Racing & Gaming Comm'n, *Commission History*, https://perma.cc/FW9T-WHFC.

In 1983, Iowa created IRGC (then called the Racing Commission) to regulate pari-mutuel wagering on horse and dog racing. *See* Iowa Code § 99D.5; *Commission History*, *supra*. Its authority since expanded to include casinos, sports wagering, and fantasy sports. Iowa Code §§ 99E.3(1), 99F.4. But gambling generally remains illegal in Iowa, "permissible only if authorized by a specific statutory exception." *Hawkeye Commodity Promotions*, 486 F.3d at 438. And it "is a heavily regulated industry," with safeguards designed to mitigate risk. *Id.* at 439. The Commission's authority extends primarily to licensees; it does not enforce criminal violations of the statutes it enforces, Chapters 99D, 99E, and 99F. *See* Iowa Code § 80.25A.

In 2019, Iowa legalized sports gambling. *See* Act of May 13, 2019, 2019 Iowa Acts ch. 132. Bookmaking—"accepting bets upon the outcome of future contingent events as a business," including sporting events—remains generally illegal. Iowa Code §§ 725.7(1)(*e*), 725.13. Taking sports wagers in Iowa without a license is a felony. *Id.* § 99F.9(4)(*c*). But entities licensed by IRGC may offer sports wagering if they meet certain limited requirements in chapter 99F. Licensees who want to offer sports betting—whether online or in-person—must partner with an Iowa-licensed casino or racetrack. *Id.* §§ 99F.9(4)(*a*)(1), (*b*), 99F.7A(3). And sports-wagering licensees must comply with extensive regulatory requirements, designed to protect consumers and sports integrity. *See*, *e.g.*, *id.* §§ 99F.4(22), 99F.7A(2)–(4), 99F.9(4)(*a*)(3), 99F.12(1)–(2); *see also* Iowa Admin. Code rs. 491-13.2–.3, 13.5.

## II. Federal Gambling Laws Defer to State Gambling Policies.

The federal approach to gambling has been to respect States' choices while backstopping gambling that crosses state lines. "[T]he States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). The Wire Act, for example, prohibits "knowingly us[ing] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information

3

assisting in the placing of bets or wagers on any sporting event or contest," but allows transmitting such information if sports betting is legal in both States. 18 U.S.C. § 1084(a)–(b).

Other statutes also presuppose that States may regulate gambling. The Illegal Gambling Business Act prohibits gambling businesses that involve five or more people, "violat[e] the law of a State . . . in which it is conducted," and meet other criteria. 18 U.S.C. § 1955(b). The Indian Gaming Regulatory Act permits tribes to allow class II and class III gaming only if located in "a State that permits such gaming." 25 U.S.C. § 2710(b)(1)(A), (d)(1)(B). And the Unlawful Internet Gambling Enforcement Act ("UIGEA") defines "unlawful Internet gambling" as "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). The list goes on. *See*, *e.g.*, 15 U.S.C. §§ 1172(a), 3002(3), 3003.

For decades the "coherent federal policy" has been to "respect the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484. Congress has made one important departure from that policy: In 1992, Congress passed the Professional and Amateur Sports Protection Act, which prohibited most states from legalizing sports gambling. *See* Pub. L. No. 102-559, 106 Stat. 4227 (1992) (codified at 28 U.S.C. § 3701 *et seq.*). Congress enacted PASPA out of concern that States might legalize sports gambling, leading to addiction and risking sports integrity. *Murphy*, 584 U.S. at 460–61. But in 2018, the Supreme Court found that PASPA was unconstitutional commandeering. *Id.* at 480.

## III.   Congress Amends the CEA in Response to the 2008 Financial Crisis.

The CEA regulates "the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quotation omitted). Congress enacted the CEA (called the Grain Futures Act until 1936) to permit trading on designated contract markets ("DCMs") required to prevent price manipulation and dissemination of misleading market information. *Id.* at 361–62 & 361 n.14. In 1974, Congress created the CFTC, which assumed "exclusive jurisdiction" over commodity futures and other derivatives and took over CEA

4

enforcement. Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, §§ 101(a)(3), 201(b), 88 Stat. 1389, 1389, 1395; *see Merrill Lynch*, 456 U.S. at 365–66.

As early as the 1980s, a new financial product developed called a "swap." A swap is "a contract that typically involves an exchange of one or more payments based on the underlying value of a notional amount of one or more commodities, or other financial or economic interest, and it transfers between the parties the risk of future change in that value without also transferring an ownership interest in the underlying asset or liability." *Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 96 (D.D.C. 2013) (quotation marks omitted). "[T]he two parties to a swap agreement trade (or 'swap') the cash flows stemming from the assets or liabilities underlying the agreement." *Id.*

Before 2010, swaps were almost entirely unregulated. *See Bloomberg*, 949 F. Supp. 2d at 98. Unlike futures trades—which were required to take place on DCMs and be cleared by a derivatives clearing organization that assumed the credit risk—swaps and swap dealers were not subject to clearance, registration, or publication requirements. *Id.* at 97–99. That changed after the 2008 financial crisis, when swaps were thought to have contributed to the crisis. *DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 11 (D.D.C. 2014).

So in Dodd-Frank, Congress amended the CEA to place swaps under CFTC's exclusive jurisdiction. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010); 7 U.S.C. § 2(a). Dodd-Frank also mandated that CFTC determine which swaps must be cleared, and it required cleared swaps, like futures, to be traded on a DCM (or swap execution facility). *Bloomberg*, 949 F. Supp. 2d at 98; Dodd-Frank, § 723(a)(3), 124 Stat. at 1676–77, 1681; *see* 7 U.S.C. § 2(h).

Dodd-Frank added a Special Rule for event contracts in excluded commodities. Relevant here, an excluded commodity is "an occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties" and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). And an event contract is "a form of derivative in which the payoff is based on a specified event, occurrence, or value." *N. Am. Derivatives Exch., Inc. v. Nev. ex rel. Nev. Gaming Comm'n*, 815 F. Supp. 3d 1169, 1176 (D. Nev. 2025), *appeal pending*, No.

5

25-7187 (9th Cir.) (quotation marks omitted). It could turn on the "level of snowfall, or dollar value of damages caused by a hurricane." CFTC, *Contracts & Products*, www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Participants can take a "yes" or "no" position "on whether or to what extent a future event will happen with the goal of earning a payout." *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *2 (6th Cir. Apr. 24, 2026) (per curiam).

Congress recognized that event contracts can be easily abused by creating contracts that do "not serve any real commercial purpose" and are "used solely for gambling." 156 Cong. Rec. S5907 (July 15, 2010) (statement of Sen. Blanche Lincoln). Dodd-Frank's "Special Rule" thus authorized CFTC to prohibit event contracts as "contrary to the public interest" if they involve "activity that is unlawful under any Federal or State law," terrorism, assassination, war, "gaming," or "other similar activity determined by the Commission . . . to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule was designed "to assure that the Commission has the power" to "prevent gambling through futures markets." 156 Cong. Rec. S5906. Using its Special Rule authority, CFTC prohibited event contracts "that involve[], relate[] to, or reference[] terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law" unless approved by CFTC. 17 C.F.R. § 40.11(a)(1), (c).

## IV.    Kalshi Offers Sports Event Contracts on Its Designated Contract Market.

Kalshi describes itself as a "derivatives exchange and prediction market" on which users can trade "event contracts." Dkt. 1 ¶ 20. It also held itself out as a sports-betting platform, advertising "Sports Betting Legal in all 50 States on Kalshi." Gouker, *Ten Times Kalshi Said People Could Bet on Things*, *supra*.

CFTC certified Kalshi as a DCM in 2020. Dkt. 20-1 at 7. Kalshi initially offered event contracts based on commodities, technology, finance, health, cryptocurrencies, popular culture, politics, and economics. *Schuler*, 2026 WL 1295806, at *2; Dkt. 20-1 at 7. In 2023, Kalshi self-certified event contracts involving election outcomes, but CFTC prohibited Kalshi from listing those contracts under the Special Rule. *See KalshiEX LLC v. CFTC*, 119 F.4th 58, 61–63 (D.C. Cir. 2024). Kalshi argued elections event contracts did not involve "gaming," because event

contracts involve gaming if they are "contingent on a game or a game-related event," "like the Kentucky Derby, Super Bowl, or Masters golf tournament, all of which were mentioned in the [Special Rule's] only legislative history." Brief of Appellee at 17, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024). And "a contract on the outcome of a sporting event" is "[t]he classic example" of a gaming event contract. *Id.* at 41. "[T]he legislative history directly confirms" that "Congress did not want sports betting to be conducted on derivatives markets." *Id.*

Two months later, Kalshi started offering sports event contracts, making Kalshi—in its own words—"The First Nationwide Legal Sports Betting Platform." Gouker, *Ten Times Kalshi Said People Could Bet on Things*, *supra*. After Kalshi self-certified its first sports event contract in January 2025, CFTC requested that Kalshi demonstrate CEA compliance but did not take further action. Dkt. 20-1 at 7–8. Kalshi's sports event contracts offer users the opportunity to wager on the outcome of individual games, on a player's game statistics, multiple-leg parlays, and even whether certain words will be mentioned during broadcasts. *E.g.*, Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026), https://perma.cc/4VPF-AMRB. For example, Kalshi listed contracts for whether NBC's Super Bowl announcers would say "Tom Brady." David Purdum, *Bettors Raising Stakes on What Super Bowl Announcers Say*, ESPN (Feb. 2, 2026), https://perma.cc/VK9K-WDCM.

Since Kalshi began offering sports event contracts, business has boomed. Kalshi's active monthly users skyrocketed from 600,000 to 5.1 million. Grant Mitchell, *Kalshi, Prediction Markets Stealing Market Space from Top Sportsbooks*, Covers (Feb. 16, 2026), https://yhoo.it/4wu4yRR. In May, Kalshi reached $10.44 billion in trading on sports markets. Chinmay Vaidya, *Kalshi Sports Prediction Markets See Over $300 Million Traded on 2026 World Cup*, CBS Sports (June 17, 2026), https://bit.ly/4vML5fj.

Kalshi is engaged in litigation across the country over whether States can regulate Kalshi's event contracts as gambling, including many pre-enforcement suits. Though courts are split, many have concluded that States may enforce against Kalshi and other prediction markets. *Schuler*, 2026 WL 1295806; *KalshiEX, LLC v. Schuler*, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026), *appeal*

*pending*, No. 26-3196 (6th Cir.); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025), *appeal pending*, No. 25-7516 (9th Cir.); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal pending*, No. 25-1892 (4th Cir.); *KalshiEX LLC v. Williams*, 2026 WL 1961872 (S.D.N.Y. July 7, 2026), *appeal pending,* No. 26-1835 (2d Cir.); Opinion and Order Denying Plaintiff's Motion for a Preliminary Injunction, *Robinhood Derivatives, LLC v. Nessel*, No. 1:26-cv-730 (W.D. Mich. June 17, 2026), *appeal pending*, No. 26-1542 (6th Cir.); *QCX LLC v. Nessel*, 2026 WL 1895958 (W.D. Mich. June 17, 2026), *appeal pending*, No. 26-1552 (6th Cir.); *N. Am. Derivatives Exch.*, 815 F. Supp. 3d 1169.

Iowa has neither enforced nor threatened to enforce its gambling laws against Kalshi. Nor does the Attorney General have an open investigation against Kalshi. And the Attorney General told Kalshi as much. Yet Kalshi filed this pre-enforcement suit asking this Court to hold that the CEA preempts all Iowa laws that could apply to Kalshi's platform, including entire chapters of the Iowa Code. Dkt. 1 at 24. Kalshi seeks preliminary and permanent injunctive relief against Attorney General Brenna Bird, IRGC, and IRGC officials. Dkt. 1 ¶¶ 18, 21–28; Dkt. 20-1 at 1.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). Kalshi seeks to enjoin enforcement of state statutes, so it bears the burden to satisfy the threshold requirement that it is "likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (en banc). That "more rigorous standard" ensures that "a state's presumptively reasonable democratic processes" are not thwarted without "an appropriately deferential analysis." *Id.* at 733.

## ARGUMENT

I.    **Kalshi Is Not Likely To Succeed On The Merits.**

    A.    **Kalshi lacks standing to seek sweeping relief against entire Code chapters.**

"[P]laintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quotation marks omitted). "Establishing harm under one provision does not allow a plaintiff to

8

challenge others." *Hershey v. Jasinski*, 86 F.4th 1224, 1229 (8th Cir. 2023) (cleaned up).

Kalshi fails to establish standing as to each challenged section. Rather than identify any specific provision for which it has standing, Kalshi seeks blanket injunctive relief enjoining enforcement of nine entire chapters of the Iowa Code—99, 99A, 99B, 99C,[1] 99D, 99E,[2] 99F, 99G, and 725—along with "any other Iowa law" that could affect event contracts. Dkt. 1 at 24; Dkt. 20-1 at 1. That is not enough for standing. Closer inspection highlights Kalshi's flaw. *First*, Kalshi cannot show that all—or even most—provisions within those nine chapters injure Kalshi. For example, chapter 99 categorizes prostitution and gambling houses as nuisances, but Kalshi has not alleged that it intends to establish a prostitution or gambling house. Iowa Code § 99.1A(1); *see also*, *e.g.*, *id.* §§ 725.1–4 (prostitution-related crimes). Chapter 99B regulates social and charitable gambling events, like bingo—but Kalshi does not suggest that it intends to offer bingo. *E.g.*, *id.* § 99B.21. And Kalshi has not shown injury even for the specific parts of 99F Kalshi cites. Dkt. 20-1 at 21 (citing Iowa Code §§ 99F.7A(3), 99F.9(4)(*a*)(3)). Those sports-wagering requirements apply only to licensed entities, which Kalshi is not. *See* Iowa Code §§ 99F.7A(3), 99F.9(4)(*a*)–(*b*).

*Second*, Kalshi fails to establish each Defendant's role in enforcing each challenged law, and thus lacks traceability and redressability. Consider IRGC and IRGC-official Defendants. Kalshi asks this Court to enjoin them from enforcing all nine chapters. But IRGC oversees the administration only of chapters 99D, 99E, and 99F. *See* Iowa Code §§ 99D.7, 99E.3, 99F.4. And IRGC and its officials' authority under those Chapters extends almost entirely to licensed entities (it lacks criminal enforcement authority). Yet Kalshi does not plead that it is Iowa-licensed.

Next consider the Attorney General Defendant. The Attorney General cannot enforce every part of those nine chapters. *See*, *e.g.*, Iowa Code § 99F.4(1) (granting the Commission authority to investigate license applicants and select licensees). Her authority extends to criminal violations, *e.g.*, Chapter 725; but she neither issues licenses nor administratively regulates licensees.

---

[1] Kalshi's brief asks to enjoin enforcement of chapter 99C, *see* Dkt. 20-1 at 1, but the Complaint does not mention it, *see* Dkt. 1. No matter, chapter 99C is "Reserved." There is no law enforcement to enjoin.

[2] While Kalshi's complaint mentions chapter 99E, *see*, *e.g.*, Dkt. 1 ¶¶ 14, 63, the preliminary injunction brief does not mention it even once, Dkt. 20-1. Thus, any injunction as to that chapter is forfeited.

Kalshi "must make a clear showing that [it] is likely to establish each element of standing" as to each challenged law. *Murthy*, 603 U.S. at 58 (quotation marks omitted). It must identify specific statutory provisions for which it alleges an injury traceable to a named defendant and redressable by injunctive relief against that defendant. *See Hershey*, 86 F.4th at 1229; *Murthy*, 603 U.S. at 61 (all elements must "line up"). But Kalshi has not done that work. Instead, Kalshi has left to the Court and Defendants to sift through its allegations and all challenged Iowa Code chapters to determine standing. But neither Defendants nor this Court should have to do Kalshi's homework. Kalshi lacks standing for the sweeping preliminary injunction it seeks.

**B.        Kalshi cannot sue under the *Ex Parte Young* exception to sovereign immunity.**

Even if Kalshi has standing, Kalshi lacks a cause of action to challenge Iowa's gambling laws. Kalshi's sole claim is under the Supremacy Clause. Dkt. 1 ¶¶ 68–74. So Kalshi must ground any cause of action in *Ex parte Young* and its anti-suit injunction, a "narrow exception" to sovereign immunity. *Filyaw v. Corsi*, 150 F.4th 936, 941 (8th Cir. 2025) (quotation omitted).

The *Ex parte Young* exception does not apply to any Defendant. For starters, Kalshi cannot sue IRGC, a state entity attached to the Department of Inspections, Appeals, and Licensing. Iowa Code § 99D.5(1). *Ex parte Young* allows suit against state officials, not agencies, so IRGC should be dismissed from this suit. *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594, 597 (8th Cir. 2007).

Kalshi cannot sue the individual defendants either because Kalshi is not "about to" be subject to enforcement of Iowa's gambling laws. *Ex parte Young* allows people "about to" be subject to state action that would violate federal law to bring injunctive actions against state officials. 209 U.S. 123, 155–56 (1908). That requires courts to "consider each defendant's role." *Minn. Chapter of Associated Builders & Contractors v. Ellison*, 153 F.4th 695, 698 (8th Cir. 2025). To sue a state official, the official must have "some connection with the enforcement" of the challenged law and must "threaten and be about to commence proceedings." *Id.* (cleaned up).

*First*, as in the standing analysis, Kalshi has not established that Defendants have an enforcement role for all nine chapters. As far as IRGC officials, Kalshi's complaint merely alleges that IRGC is "the state's gaming regulator." Dkt. 1 ¶ 27. But IRGC only enforces chapters 99D,

10

99E, and 99F; it does not enforce chapters 99, 99A, 99B, 99C, 99G, and 725. *See* Iowa Code §§ 99D.7, 99E.3, 99F.4. Nor has Kalshi identified which specific provisions the Attorney General enforces within the nine Iowa Code chapters Kalshi challenges. *See* Dkt. 1 ¶¶ 21, 28.

*Second*, Kalshi has not alleged any facts to suggest that enforcement is imminent. Kalshi's purported threat-of-enforcement allegations concern only Attorney General Bird, not IRGC. Dkt. 1 ¶¶ 2, 13–14, 61–62, 64. That alone requires this Court to dismiss IRGC officials from this suit. *See Minn. Chapter of Associated Builders & Contractors*, 153 F.4th at 701–02.

As to the Attorney General, Kalshi cannot sue her under *Ex parte Young* because she has not threatened to enforce against Kalshi. She is not currently investigating Kalshi or enforcing Iowa's gambling laws against Kalshi. Blankinship Decl. ¶¶ 4–11. To the contrary, as Kalshi concedes, her office promised not to enforce pending this motion. Dkt. 20-1 at 9. The Attorney General's office ordinarily does not provide such guarantees in preliminary-injunction proceedings but departed from its typical practice because there was no ongoing or forthcoming investigation or enforcement. Blankinship Decl. ¶¶ 6–10. Kalshi is not "about to" be sued.

With no present threat of enforcement, Kalshi relies on its meeting with Attorney General Bird and the fact that the Attorney General's office has declined to promise that it will never enforce against Kalshi in the future. Dkt. 20-1 at 8–9. But the mere possibility that an official "might in the future . . . undertake enforcement action" "cannot support an *Ex parte Young* suit." *Minn. Chapter of Associated Builders & Contractors*, 153 F.4th at 699 (quotation omitted); *see also Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, 33 F.4th 985, 991–92 (8th Cir. 2022). Kalshi thus lacks a cause of action against the Attorney General as to any Chapter.

### C.    The Commodity Exchange Act Does Not Preempt Iowa's Gambling Laws.

The CEA does not preempt Iowa's gambling laws. Kalshi's sports event contracts are not "swaps." And even if they are, the CEA does not preempt state gambling laws.

#### 1.  Kalshi's sports event contracts are not "swaps" under the CEA.

Kalshi's preemption argument hinges on its event contracts being "swaps" under CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). But the Act's text, structure, and history do not

support Kalshi. Kalshi's theory could sweep all betting—including all sports-gambling businesses currently operating under State law and even other forms of gambling—under CFTC's jurisdiction.

The CEA provides six "swap" definitions. 7 U.S.C. § 1a(47)(A). Those include specifically enumerated types of swaps that transfer financial risk without conveying an ownership interest in an asset, including interest-rate swaps. *Id.* § 1a(47)(A)(iii). Swaps also include options relating to economic interests or property. *Id.* § 1a(47)(A)(i). In short, the standard definitions—enumerated swaps such as interest-rate, credit, weather, and currency swaps; certain options; security-based swap agreements; instruments "commonly known to the trade" as swaps; and combinations of the foregoing—refer to recognized financial instruments and measures. *Id.* § 1a(47)(A)(i), (iii)–(vi).

Kalshi relies on the remaining definition, which defines a swap as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). That fails for two reasons.

*First*, a swap is a payment that depends on the "occurrence . . . of an event." 7 U.S.C. § 1a(47)(A)(ii). But Kalshi's contracts turn on the *outcome* of the sporting event, not whether the event takes place. "[T]he ordinary meaning of event in terms of sports would be the sporting event itself, not who wins it." *N. Am. Derivatives Exch.*, 815 F. Supp. 3d at 1183. So, for example, "[a]n ordinary American interpreting the word 'event' would conclude that the Kentucky Derby is an event." *Id.* "But who wins the Kentucky Derby is an outcome of that event." *Id.*

That ordinary understanding is reflected by laws which use the words "outcome" and "event" differently. Iowa defines bookmaking as the acceptance of bets "upon the *outcome* of future contingent events," including sporting events. Iowa Code § 725.13 (emphasis added). So because "Kalshi's event contracts are based on the outcomes of sporting events or on things that happen during a sporting event," they are not swaps. *Hendrick*, 817 F. Supp. 3d at 1026.

*Second*, Kalshi's sports event contracts are not "associated with a potential financial, economic, or commercial consequence" in the sense the CEA requires. 7 U.S.C. § 1a(47)(A)(ii).

Kalshi says sports event contracts are swaps because sports events have consequences "for a broad system of stakeholders, including team sponsors, advertisers, television networks, franchises, local communities, and more." Dkt. 20-1 at 11 n.1. That, of course, is a reversal of the position Kalshi took less than two years ago. As Kalshi said, the "basic purpose" of DCMs is "to allow 'hedging' of economic risk." Brief of Appellee at 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024). But "contracts relating to *games*," which include "activities conducted for diversion or amusement" like the Super Bowl, "are unlikely to serve any commercial or hedging interest." *Id.* at 44–45 (quotation marks omitted). That principle applies both to contracts that turn on a game's outcome and to other sports-related contracts. Kalshi cannot plausibly contend that whether an announcer will say "Tom Brady" on a broadcast has independent economic significance.

Kalshi cannot let someone bet on whether a butterfly will flap its wings because of the potential for rainfall in India. And just because a game's outcome might have downstream economic consequences somewhere in the world does not mean that Kalshi's event contracts are "associated with a potential financial, economic, or commercial consequence" for CEA purposes. *See Hendrick*, 817 F. Supp. 3d at 1031. A "statute's meaning does not always turn solely on the broadest imaginable definitions of its component words." *Id.* (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018)); *see also* Order at 6–7, *Robinhood Derivatives*, No. 1:26-cv-00730.

Read in context of the five other definitions, 7 U.S.C. § 1a(47)(A), which all refer to financial instruments and measures, a swap is a transaction that "involv[es] financial instruments and measures that traditionally and directly affect commodity prices," such as "[c]urrency exchange rates, the weather, and energy costs." *Schuler*, 2026 WL 657004, at *6. "[T]he event or contingency itself" thus must have "some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences." *Hendrick*, 817 F. Supp. 3d at 1027. That interpretation gives meaning to the other five definitions rather than swallowing them whole.

Kalshi's interpretation renders those definitions superfluous. It "knows no limiting principle." *Hendrick*, 817 F. Supp. 3d at 1027. It sweeps all legal sports-betting businesses

13

currently regulated by States under CFTC—a result Congress did not intend by enacting Dodd-Frank. After all, if Kalshi's sports event contracts are swaps because they are "a contract for payment based on the outcome of a sporting event," "then all contracts for payment based on the outcome of a sporting event—all sports bets—would be forced onto DCMs like Kalshi and every sportsbook in the country would be put out of business." *Schuler*, 2026 WL 657004, at *6; *see also N. Am. Derivatives Exch.*, 815 F. Supp. 3d at 1184–85. Under Kalshi's theory, a "swap" could also encompass other forms of gambling, such as where a payout is dependent on a random number generator acting like a slot machine. It could also sweep in service contracts, mortgages, and prenuptial agreements. *QCX*, 2026 WL 1895958, at *6.

"Had Congress intended such a sea change in the regulatory landscape, it surely would have said so." *N. Am. Derivatives Exch.*, 815 F. Supp. 3d at 1185. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *see West Virginia v. EPA*, 597 U.S. 697, 723 (2022). And federal statutes that intrude on traditional state responsibilities must do so clearly, especially when they involve "the improbably broad reach" of a "key statutory definition." *Bond v. United States*, 572 U.S. 844, 860 (2014). Congress enacted Dodd-Frank to regulate financial products that caused the financial crisis of 2008, not to "enabl[e] nationwide gambling on CFTC-designated exchanges." *Hendrick*, 817 F. Supp. 3d at 1031.

Kalshi claims (Dkt. 20-1 at 11) its interpretation is not boundless because CFTC can place limits around the definition of a swap. But agency definitions cannot overcome statutory text. And the regulation Kalshi cites confirms that "swaps" involve "risk-shifting arrangements with financial entities." Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,248 (Aug. 13, 2012).

Kalshi further argues that even if its event contracts are not swaps, they are "excluded commodities." Dkt. 20-1 at 11. But that cannot save Kalshi's suit. Excluded commodities are also "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). If Kalshi's sports event contracts are not "associated with a potential financial, economic, or commercial consequence" under the swap definition, *see id.* § 1a(47)(A)(ii), they cannot qualify as excluded commodities either. *Hendrick*, 817 F. Supp. 3d at 1033; Order at 21, *Robinhood*

14

*Derivatives*, No. 1:26-cv-00730. And in any event, excluded commodities—defined separately from commodities, *see* 7 U.S.C. § 1a(9)—do not fall within CFTC's exclusive jurisdiction, *see id.* § 2(a)(1)(A); *Hendrick*, 817 F. Supp. 3d at 1033–34.

### 2. The CEA does not preempt Iowa's gambling laws.

Even if Kalshi's event contracts are swaps, the CEA does not preempt Iowa's gambling laws. States have "the power to regulate gambling in the interest of the public health, safety, and general welfare." *Hawkeye Commodity Promotions*, 486 F.3d at 438 (quotation marks omitted). And courts do not read federal law to supersede a State's historic police powers "unless that is the clear and manifest purpose of Congress." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1140 (8th Cir. 2024) (cleaned up).

**Field Preemption.** Kalshi contends (Dkt. 20-1 at 12) that the CEA expressly and impliedly field-preempts Iowa's gambling laws. But the CEA does not field-preempt Iowa's gambling laws, either expressly or impliedly. *Schuler*, 2026 WL 1295806, at *5.

*First*, the CEA does not expressly preempt the field of sports event contracts, much less the broader field Kalshi invokes: event contracts on derivative markets. Field preemption occurs when Congress has "intended to foreclose any state regulation in the *area*, irrespective of whether state law is consistent or inconsistent with federal standards." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quotation marks omitted). But no CEA provision preempts all State law from applying to sports event contracts or futures regulation more broadly.

To the contrary, the CEA contemplates States' role in the commodities sphere. The CEA permits States to enforce both their civil and criminal fraud laws. 7 U.S.C. § 13a-2(7); *see also Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281, 288 (8th Cir. 1984). Even Kalshi agrees that its contracts are governed by state contract law. *Schuler*, 2026 WL 1295806, at *5 (Kalshi's rulebook provides that suits between users "will be governed by New York law"). Nor does the CEA reflect any intent to alter the federal-state balance on gambling policy.

The CEA's savings clauses also confirm that it does not preempt the field. *See* 7 U.S.C. § 2(a)(1)(A). After all, "the presence of a savings clause usually signals that Congress does not

15

mean to preempt *the field*." *Schuler*, 2026 WL 1295806, at *5. Even Kalshi's own case (Dkt. 20-1 at 20) says the same: "Congress did not intend to preempt the field of futures trading." *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1155 (7th Cir. 1992). The Special Rule's reliance on State law further confirms that the CEA does not field-preempt State gambling laws. 7 U.S.C. § 7a-2(c)(5)(C)(i).

And when the CEA preempts state law—including state gambling laws—it does so expressly, and only in specific circumstances. For example, the CEA prohibits States from regulating swaps as insurance. 7 U.S.C. § 16(h). And it expressly preempts state gambling laws in specific situations (which Kalshi does not argue apply here), stating that the CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops" in certain circumstances. *Id.* §§ 16(e)(2), 27f(b). Those preemption clauses would be unnecessary if the CEA field-preempts state law from applying to swaps. *Williams*, 2026 WL 1961872, at *7.

Kalshi nevertheless contends that the CEA preempts the field of futures regulation because it gives CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). But that clause's purpose "was to separate the functions of [CFTC] from those of the Securities and Exchange Commission and other regulatory agencies," and it was "intended only to consolidate federal regulation of commodity futures trading in the Commission." *Merrill Lynch*, 456 U.S. at 386–87. "Congress's clearest intent . . . was to make clear that as among *federal agencies*, CFTC would have exclusive authority, rather than the SEC." *Martin*, 793 F. Supp. 3d at 678.

And a "typical [preemption] provision"—even in the CEA—normally "uses words like 'preempt' or 'supersede' when it comes to state law." *Schuler*, 2026 WL 1295806, at *4. But the CEA uses "exclusive jurisdiction." That would be an odd preemption clause. Indeed, such "'exclusive jurisdiction' language usually applies to *courts* rather than *agencies*." *Id.* The exclusive-jurisdiction clause here thus "identifies the governing *agency* (the CFTC rather than the

16

SEC or a state regulator), not the governing *law* (whether federal or state)." *Id.* The exclusive-jurisdiction clause's two savings clauses confirm that reading. *See* 7 U.S.C. § 2(a)(1)(A).

Kalshi contends (Dkt. 20-1 at 13) that such "exclusive jurisdiction" provisions automatically field-preempt state law. But the cases Kalshi cites for that proposition do not bear that out. *Freightliner Corp. v. Myrick* did not involve an exclusive-jurisdiction clause at all, and, in any event, the challenged state-law suits were not preempted in that case. *See* 514 U.S. 280, 284, 287, 289 (1995). The exclusive-jurisdiction clause in *BNSF Railway Co. v. Hiett* expressly preempted state remedies. *See* 22 F.4th 1190, 1194 (10th Cir. 2022). And *Hughes v. Talen Energy Marketing, LLC* did not involve a preemption provision with the savings clauses at issue here and itself affirmed that States may regulate "even when their laws incidentally affect areas within" a federal agency's jurisdiction. 578 U.S. 150, 164 (2016).

Nor do recent cases across the country support Kalshi here: (1) *Flaherty*, 172 F.4th 220 (3d Cir. 2026) was in a preliminary posture, and thus not precedential; plus, the court's analysis rested on an impermissibly broad definition of "swaps," and its savings-clause reading conflicts with *Schuler*'s textual analysis; (2) *Johnson*, 2026 WL 1223373 (D. Ariz. May 5, 2026) (appeal pending) was a suit brought by the United States and CFTC, not a private DCM, so not only does it say nothing about a DCM's cause of action, it largely repeats *Flaherty* on preemption; (3) *Orgel*, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (appeal pending) resolved on conflict preemption only, so it did not decide this exclusive-jurisdiction field-preemption question.

Kalshi also cites (Dkt. 20-1 at 14–15) legislative history from the 1974 CEA amendments. But that legislative history refers to the field of "futures regulation," not gambling. It also speaks in terms of conflict, not field, preemption: preemption would apply to "any substantive State law regulating futures trading . . . contrary to or inconsistent with Federal law." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.). Legislative history in any event cannot provide a clear preemptive statement. Kalshi further contends (Dkt. 20-1 at 13) that the presumption against preemption does not apply because the exclusive-jurisdiction clause is an express-preemption provision. But the exclusive-jurisdiction clause is not an express-preemption provision. *Schuler*, 2026 WL 1295806, at *4–5.

17

Kalshi argues (Dkt. 20-1 at 19) that UIGEA's exclusion of CEA-registered-entity transactions from "bet or wager," 31 U.S.C. § 5362(1)(E)(ii), shows state gambling laws do not reach DCMs. But that exclusion merely limits the scope of a federal criminal statute, and the UIGEA expressly disclaims any effect on State gambling laws. *Id.* § 5361(b). Kalshi further contends (Dkt. 20-1 at 18) that 7 U.S.C. § 13a-2(1), which prohibits States from bringing suits for CEA violations against DCMs, and 7 U.S.C. § 13a-2(7), which allows States to enforce antifraud laws against DCMs, prevent States from enforcing gambling laws against DCMs. But § 13a-2(1) applies only to CEA violations, not State law violations. And Kalshi's negative-implication argument based on the antifraud provision proves too much: it would, for example, displace State contract law, which Kalshi concedes applies to it.

So even assuming Kalshi's sports event contracts are swaps or excluded commodities under the Special Rule, the exclusive-jurisdiction clause cannot bear the weight Kalshi places on it.

And even if the exclusive-jurisdiction clause is field-preemptive to some extent, Kalshi defines the "field" too broadly. *See Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (the first step is to "identify the field" at issue). Simply because Congress granted CFTC exclusive jurisdiction over swaps "does not mean that the 'field' Congress intended for the CEA to occupy includes state gambling laws, and specifically sports wagering laws." *Martin*, 793 F. Supp. 3d at 679.

When addressing field preemption, courts "consider[] the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok*, 575 U.S. at 385. "[N]ot every state law that in some remote way may affect" some area of federal regulation "can be said to fall within the pre-empted field." *English v. Gen. Elec. Co.*, 496 U.S. 72, 85 (1990). Nothing in Iowa's gambling laws targets DCMs, swaps, event contracts, or futures markets. Instead, those laws have "broad applicability" and are "aimed at . . . all businesses in the marketplace." *Oneok*, 575 U.S. at 387.

*Second*, the CEA does not impliedly preempt the field of sports event contracts. Field preemption applies only "[i]n rare cases" when "Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas*, 589 U.S. at 208 (quotation marks omitted).

The CEA makes clear that it does not preempt the futures-regulation field. And the CEA's regulation of event contracts specifically is far from comprehensive. It does not, for example, include the types of restrictions one would expect to see if Congress intended nationwide legalization of sports gambling, such as a regulatory framework to protect sports integrity and address gambling addiction. The contention that Dodd-Frank intended to subtly legalize sports gambling nationwide on DCMs—without any federal regulation and completely excluding States, all while PASPA still prohibited sports betting—exceeds plausibility.

Kalshi contends (Dkt. 20-1 at 17–19) that the CEA field-preempts state gambling laws because the CEA comprehensively regulates DCMs. But even if true, Congress's comprehensive regulation of one area of law does not mean that it also comprehensively regulates all other tangentially related areas of law. So, for example, federal immigration law creates "a comprehensive and unified" alien registration system but "does not create a comprehensive and unified system regarding the information that a State may require employees to provide." *Kansas*, 589 U.S. at 210 (quotation omitted). So too here.

Kalshi cites (Dkt. 20-1 at 15–17) CFTC's position that the CEA preempts state gambling laws if they affect event contracts. But CFTC regulations and litigation positions cannot override statutory text. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 408 (2024).

Kalshi points (Dkt. 20-1 at 18) to the Special Rule authorizing CFTC to prohibit event contracts that are contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11. But the Special Rule does not preempt any State laws, much less field-preempt. To the contrary, the Special Rule expressly preserves a role for state law, permitting CFTC to ban event contracts that involve gaming or any other "activity that is unlawful under any . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). The Special Rule was designed as a backstop to ensure DCMs are not used as a platform for sports gambling, not to provide an escape hatch to avoid state gambling laws.

Indeed, "the mere existence of a federal regulatory or enforcement scheme" does not preempt state law. *English*, 496 U.S. at 87. Just because CFTC "may" prohibit such contracts does not mean States cannot apply their laws to sports wagers disguised as event contracts. Nor does it

19

help Kalshi for CFTC to transform itself into the nation's gambling regulator. Preemption "must stem from either the Constitution itself or a valid statute enacted by Congress." *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1093 (2026) (quoting *Kansas*, 589 U.S. at 202). So preemption applies only "when and if the agency is acting within the scope of its congressionally delegated authority." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019) (cleaned up).

Congress did not intend to preempt state sports gambling laws through the CEA. Gambling "has traditionally been regulated at the state level," so courts "must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted." *Pharm. Rsch.*, 95 F.4th at 1144. The CEA does not provide that clear showing.

***Conflict Preemption.*** The CEA does not conflict-preempt Iowa's gambling laws either. Conflict preemption applies when it is not "possible to comply" with both federal and state law or when state law "stand[s] as an obstacle to the accomplishment and execution of the full purposes" of Congress. *Kansas*, 589 U.S. at 211 (quotation marks omitted). Neither type applies here.

*First*, evidence of preemptive purpose must "be sought in the text and structure of the statute at issue." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (lead op.) (quotation marks omitted). So obstacle preemption "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1178 (8th Cir. 2023) (quotation omitted). And it "requires the state law to stand in the way of the objectives of Congress, not the [agency]." *Id.* Kalshi does not explain why applying Iowa's gambling laws frustrates the CEA's purposes as to each type of event contracts as to which Kalshi seeks injunctive relief.

Consider Kalshi's sports event contracts. There is no evidence that Congress intended the CEA, or, more specifically, Dodd-Frank, to sweep away all state-law sports-wagering regulations that might incidentally affect prediction markets. And the Special Rule—designed to ensure DCMs do not become a platform for gambling—expressly includes State law as a basis for informing CFTC's public-interest determinations. 7 U.S.C. § 7a-2(c)(5)(C)(i)(I).

20

Kalshi relies (Dkt. 20-1 at 20–21) on generic uniformity interests. But no statute "pursues its stated purpose at all costs." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (cleaned up). Kalshi must therefore "identify more than generic uniformity concerns." *Schuler*, 2026 WL 1295806, at *6 (quotation marks omitted). And Kalshi ignores the Special Rule's purpose of preventing gambling and ensuring compliance with state law.

Kalshi cites (Dkt. 20-1 at 20) the Seventh Circuit's opinion in *American Agriculture Movement, Inc. v. Board of Trade of City of Chicago* for the proposition that the CEA obstacle-preempts Iowa's gambling laws as applied to event contracts because of an interest in uniformity. But that case does not help Kalshi. For starters, *American Agriculture* undermines Kalshi's field-preemption argument. And its conflict-preemption analysis—pre-Dodd-Frank and involving state common-law claims regarding a resolution declaring a market emergency, 977 F.2d at 1151, 1153—does not address the Special Rule or analyze how the CEA affects state gambling laws.

Kalshi next claims (Dkt. 20-1 at 22) Iowa's gambling laws are obstacle-preempted because applying Iowa law interferes with CFTC's Special Rule discretion. But the Special Rule was designed to prevent gambling on DCMs, not advance it. *Williams*, 2026 WL 1961872, at *9. Iowa's sports-gambling laws thus reflect the Special Rule's purpose. And nothing in the Special Rule gives CFTC exclusive authority over sports event contracts or otherwise demonstrates the "clear and manifest" intent required to displace state gambling laws. *Pharm. Rsch.*, 95 F.4th at 1140.

*Second*, impossibility preemption fails too. It is a "demanding" standard, *Wyeth v. Levine*, 555 U.S. 555, 573 (2009), that "exists when it is impossible for a private party to comply with both state and federal requirements," *Pharm. Rsch.*, 95 F.4th at 1145 (quotation marks omitted). Just because "multiple legal requirements" apply does not make compliance impossible. *Id.* And a mere "possibility of impossibility" does not preempt. *Merck*, 587 U.S. at 314 (quotation omitted). The party asserting preemption needs "clear evidence" of impossibility, even when "the laws of one sovereign permit an activity that the laws of the other sovereign restrict or even prohibit." *Id.*

There is no reason why Kalshi cannot comply with both the CEA and Iowa's gambling laws when offering its event contracts. *Williams*, 2026 WL 1961872, at *8. The Special Rule

21

authorizes CFTC to prohibit event contracts that are contrary to the public interest, including those that involve gaming or violate State law. 7 U.S.C. § 7a-2(c)(5)(C)(i). CFTC's regulations in turn prohibit event contracts that involve gaming or other activities that violate State law. 17 C.F.R. § 40.11(a). So there would be no conflict even if Iowa completely prohibited sports wagering.

The possibility of a conflict is even more remote under Iowa's licensing framework, which permits sports gambling under certain conditions, some of which are remarkably similar to CEA requirements. Under the CEA, Kalshi must be approved as a DCM, establish and enforce rules for its contract market, prevent manipulation and price distortion, make available to participants the contract market's rules, and keep records. 7 U.S.C. § 7(a), (d). Iowa's sports-gambling laws mirror those requirements. For example, Iowa requires sports-wagering operators to be licensed, establish and post rules, take reasonable steps to ensure that individuals involved in sporting events do not place wagers, and keep books and records. Iowa Code §§ 99F.9(4)(*a*)(1), (*b*), 99F.7A(2)(*b*), (3)–(4), 99F.12(1). And sports-wagering operators must comply with the Commission's voluntary self-exclusion program for individuals with gambling addiction, post online the statewide gambling-addiction phone number, prohibit the use of credit cards for sports wagering, and pay state taxes. *Id.* §§ 99F.4(22), 99F.7A(2)(*a*), 99F.9(7), 99F.11(5). Sports-wagering operators must also permit wagers only by individuals twenty-one years of age or older and located within Iowa. *Id.* § 99F.9(4)(a)(3); *see also id.* § 99F.15(2).

None of that conflicts with the CEA. It serves complementary purposes: the CEA "seek[s] to address the efficient functioning of the derivatives and futures markets," and Iowa is "focused on protecting the public from potential gambling issues." *Martin*, 793 F. Supp. 3d at 686.

Kalshi focuses (Dkt. 20-1 at 21) on Iowa's requirement that operators offer sports wagering only to users located within Iowa, contending that CFTC regulations require Kalshi to provide traders with "impartial access" to its contract market. 17 C.F.R. § 38.151(b). But the "impartial access" rule is designed to ensure that "[a]ccess to a DCM [is] based on the financial and operational soundness of a participant, rather than discriminatory or other improper motives." *Core Principles and Other Requirements for Designated Contract Markets*, 75 Fed. Reg. 80,572, 80,579

(Dec. 22, 2010). A DCM participant shows financial soundness "either by showing that it is a clearing member of a [designated clearing organization] that clears products traded on that DCM or by showing that it has clearing arrangements in place with such a clearing member." *Id.*

The impartial-access rule does not require DCMs to treat participants identically. After all, DCMs "may establish different categories of market participants" and may reasonably vary fee structures. 75 Fed. Reg. at 80,579. So Kalshi does "not discriminate against nonresidents of [Iowa] by complying with the State's gambling laws any more than a company would discriminate against nonresidents by charging [Iowa] sales tax for the nonresident's in-state purchases." *Schuler*, 2026 WL 1295806, at *6; *see also Williams*, 2026 WL 1961872, at *8.

And as a practical matter, Kalshi cannot evade state gambling laws by claiming that geofencing is impossible. "Other companies have also complied with both the federal impartial-access requirement and state sports-gaming laws by using geofencing to create a market for participants in one State and then giving impartial access to those individuals." *Schuler*, 2026 WL 1295806, at *6. Kalshi asserts that limiting its Iowa market to Iowa residents could raise price-manipulation and market-surveillance challenges, but fails to show how compliance with both federal and Iowa law would be impossible, not merely "challeng[ing]." Dkt. 20-1 at 21.

Even if one or more Iowa requirements conflict with the CEA, Kalshi cannot plausibly contend that all of Iowa's sports-wagering laws do, nor that all nine challenged Chapters do. State law is preempted only "to the extent that it actually conflicts with federal law." *Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*, 468 U.S. 491, 501 (1984). Requiring Kalshi to post a gambling addiction hotline or pay state taxes, for example, creates no CEA conflict.

* * *

Courts should not grant injunctions that are "broader than necessary to remedy the underlying wrong." *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998). Kalshi asks the Court to enjoin Defendants from enforcing every part of nine Iowa Code Chapters. But many have nothing to do with Kalshi's at-issue conduct. Kalshi chose to bring this effectively facial injunction

23

against nine chapters of Iowa law. If the Court finds any part of those chapters enforceable, it should deny the injunction. *See United States v. Evans*, 175 F.4th 950, 954 (8th Cir. 2026).

## II.   The Other Factors Weigh Against Plaintiff's Requested Relief.

Because Kalshi is not likely to succeed on the merits, the Court need not proceed to the other preliminary-injunction factors. *See Rounds*, 530 F.3d at 732; *see Eggers v. Evnen*, 48 F.4th 561, 566 (8th Cir. 2022). But those factors also weigh against an injunction.

Kalshi's alleged harms are speculative. Irreparable harm must be "of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (quotation omitted). That standard is not satisfied. First, for pre-enforcement relief, "the prospect of state suit must be imminent." *Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374, 382 (1992). But neither the Attorney General nor IRGC has threatened imminent enforcement against Kalshi. Second, the harms Kalshi asserts—compliance costs and forgone revenue—are "largely monetary" and merely constitute the ordinary consequences of complying with generally applicable law, just like licensed sportsbooks do. *Hendrick*, 817 F. Supp. 3d at 1035; *Williams*, 2026 WL 1961872, at *10. Geolocation "uses services and methods that are well-known in the [gambling] industry." *CG Tech. Dev., LLC v. 888 Holdings, PLC*, 2022 WL 605430, at *2 (D. Nev. Mar. 1, 2022). And Kalshi already prohibits access in numerous countries. *Kalshi Retreats from India While European Regulators Target Prediction Markets*, Public Gaming (June 23, 2026), https://perma.cc/DQ8Z-GFQL. So Kalshi's "Hobson's choice" rings hollow, especially given that other companies geofence to comply with both federal and State law. *Schuler*, 2026 WL 1295806, at *6; *see also KalshiEX, LLC v. State of Nev. Gaming Control Bd.*, No. 92771 (Nev. July 1, 2026) (declining to stay order requiring Kalshi to geofence). And any fines could be challenged and vacated if Kalshi prevails on the merits, which is unlikely. Third, Kalshi's year-plus delay in seeking relief after it started offering sports event contracts undercuts any claimed urgency. *Novus Franchising*, 725 F.3d at 895.

An injunction would irreparably harm the State and is not in the public interest. States have a unique interest in protecting their people's health and well-being. *See, e.g.*, *Veix v. Sixth Ward*

24

*Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 38–39 (1940); *Murphy*, 584 U.S. at 486. And enjoining enforcement of a State's law is per se an irreparable injury: "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (cleaned up). An injunction "impede[s] the State from furthering its gaming laws' public-welfare considerations." *Schuler*, 2026 WL 1295806, at *7 (quotation marks omitted). The remaining factors firmly favor the State.

**III.    Plaintiff Must Post a Rule 65(c) Injunction Bond Before Any Injunction Takes Effect.**

A "court may issue a preliminary injunction . . . only if the movant gives security." Fed. R. Civ. P. 65(c). This Court may determine the amount of an injunction bond, but it lacks discretion to waive it. Indeed, when the Federal Rules leave the decision whether to require a bond to the court's discretion, they expressly say so. *See, e.g.*, Fed. R. App. P. 41(d)(3). The Eighth Circuit has suggested courts may waive the injunction bond, but that case relies on the "important public interest in the enforcement of NEPA," and this is not a NEPA case. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016). So if the Court finds an injunction warranted, it should require an injunction bond.

Kalshi brought this suit despite no imminent enforcement threat. And so if Kalshi gets a preliminary injunction, Defendants should be assured that any efforts they choose to pursue having now had occasion to review the law are enforceable. Kalshi faces bet-the-company litigation (often self-initiated) across the country. Iowa law allows the State to recover all the property "bet or wagered" as forfeiture for illegal gambling. Iowa Code § 725.8. If the Court enters an injunction, it should ask Kalshi for the amount of money it expects to be wagered on its platform over the pendency of the injunction (perhaps under seal) and ask for a bond equal to that amount. In the alternative, the Court should set a bond to ensure meaningful recovery if Defendants are successful on appeal to deter what would then be determined to be illegal gambling.

**CONCLUSION**

For these reasons, the Court should deny the motion for injunctive relief.

25

July 10, 2026

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*

*/s/ Catherine Frappier*
CATHERINE FRAPPIER
*Assistant Solicitor General*

Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 281-5164 / (515) 281-5132
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov
catherine.frappier@ag.iowa.gov

ATTORNEYS FOR DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*